**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHELLE BAZZINI, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>LOOP INDUSTRIES, INC., DANIEL SOLOMITA, and NELSON GENTILETTI,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michelle Bazzini ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, investigation by Plaintiff's counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Loop Industries, Inc. ("Loop" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Loop; and (c) review of other publicly available information concerning the Company.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Loop securities between September 24, 2018 and October 12, 2020, inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Loop is a technology company that purports to own proprietary technology that depolymerizes no- and low-waste PET plastic and polyester fiber.  The resulting material is used to create PET resin for food-grade packaging.

3.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) Loop scientists were encouraged to misrepresent the results of Loop's purportedly proprietary process; (ii) Loop did not have the technology to break PET down to its base chemicals at a recovery rate of 100%; (iii) as a result, the Company was unlikely to realize the purported benefits of Loop's

announced partnerships with Indorama Ventures Public Company Limited ("Indorama") and thyssenkrupp Industrial Solutions AG ("thyssenkrupp"); and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.    On October 13, 2020, Hindenburg Research published a report alleging, among other things, that "Loop's scientists, under pressure from CEO Daniel Solomita, were tacitly encouraged to lie about the results of the company's process internally."  The report also stated that "Loop's previous claims of breaking PET down to its base chemicals at a recovery rate of 100% were 'technically and industrially impossible,'" according to a former employee.  Moreover, the report alleged that "Executives from a division of key partner Thyssenkrupp, who Loop entered into a 'global alliance agreement' with in December 2018, told us their partnership is on 'indefinite' hold and that Loop 'underestimated' both costs and complexities of its process."

5.    On this news, the Company's stock price fell $3.78 per share, or over 32%, to close at $7.83 per share on October 13, 2020, thereby damaging investors.

6.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased Loop securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Loop is incorporated under the laws of Nevada with its principal executive offices located in Quebec, Canada.  Loop's common stock trades in an efficient market on the NASDAQ exchange ("NASDAQ") under the symbol "LOOP."

13.     Defendant Daniel Solomita ("Solomita") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.     Defendant Nelson Gentiletti ("Gentiletti") was the Company's Chief Financial Officer since January 1, 2019.

15.     Defendants Solomita and Gentiletti (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities

analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual

Defendants were provided with copies of the Company's reports and press releases alleged herein

to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected.  Because of their positions and access to

material non-public information available to them, the Individual Defendants knew that the

adverse facts specified herein had not been disclosed to, and were being concealed from, the public,

and that the positive representations which were being made were then materially false and/or

misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Loop is a technology company that purports to own proprietary technology that

depolymerizes no- and low-waste PET plastic and polyester fiber.  The resulting material is used

to create PET resin for food-grade packaging.

### Materially False and Misleading Statements Issued During the Class Period

17.     The Class Period begins on September 24, 2018.  On that day, Loop announced its

joint venture with Indorama in a press release that stated, in relevant part:

- Indorama Ventures' world-class manufacturing and Loop's state-of-the-art recycling technology combined to invest in multi-billion dollar sustainable PET resin and polyester market opportunity

- Demand for supply of sustainable PET sees explosive growth from beverage and consumer packaged goods companies adopting significant circular and sustainable packaging targets

- Indorama Ventures/Loop Industries partnership plan to begin production in Q1 2020

Indorama Ventures Public Company Limited (Bloomberg ticker IVL.TB), one of the world's leading petrochemical companies, and Loop Industries, Inc. (Nasdaq: LOOP), a leading technology innovator in sustainable plastic resin and polyester

today announced a joint venture to manufacture and commercialize sustainable polyester resin to meet the growing global demand from beverage and consumer packaged goods companies.

This partnership brings together Indorama Venture's world-class manufacturing footprint and Loop's proprietary science and technology to become a reliable world leader in the 'circular' economy for 100% sustainable and recycled PET resin and polyester fiber.

The Indorama Ventures/Loop Industries partnership launches a commercial solution for consumer packaged goods companies in response to the rapid growth in global plastic consumption for which there is a great need to responsibly collect and reuse these materials. Through this joint venture, Indorama Ventures and Loop Industries will be able to perpetually recycle the ever increasing amounts of PET plastic and polyester fiber proving the promise of and encouraging the shift to a circular economy.

The 50/50 joint venture will have an exclusive world-wide license to use Loop's technology to produce 100% sustainably produced PET resin and polyester fiber with plans to begin commercial production in Q1 2020. The production from the facility will be fully subscribed by leading global consumer brands.

18.     On December 19, 2018, Loop announced a "Global Alliance Agreement" with

thyssenkrupp in a press release that stated, in relevant part:

Loop Industries, Inc. (Nasdaq: LOOP), ("Loop" or the "Company"), a leading technology innovator in sustainably produced plastic, and thyssenkrupp Industrial Solutions' division, Uhde Inventa-Fischer GmbH, a leading global polyester technology provider and polyester plant engineering firm, today announced a strategic alliance expected to shape the future of PET and Polyester manufacturing. The Global Alliance Agreement advances the integration of their respective technologies intended to provide a turn-key industrial solution for license to manufacturing companies seeking a commercially viable technology to produce sustainable PET and polyester plastic.

"We have successfully established a large variety of patented technologies and processes in the global market. This agreement will enable a very resource efficient and cost-attractive solution for the production of sustainable PET and polyester," said Sami Pelkonen, CEO of the Electrolysis & Polymers Technologies business unit of thyssenkrupp Industrial Solutions. "The alliance with Loop Industries is an important milestone on the way to producing sustainable PET and polyester."

"This Global Alliance Agreement allows for Loop's technology to rapidly transform the plastic market and fully capitalize on our disruptive potential as the leader in the circular economy for PET plastic," said Daniel Solomita, Founder and

CEO of Loop Industries, "thyssenkrupp's extensive engineering expertise and proven Melt-To-Resin® technology provides Loop with a world class partner to bring the Waste-to-Resin manufacturing solution to market."

19.     On May 8, 2019, Loop filed its annual report on Form 10-K with the SEC for the period ended February 28, 2019 (the "2019 10-K").  Therein, the Company described its purported technology, stating, in relevant part:

**Our Technology**

The power of our technology lies in its ability to divert and recover what is currently considered plastic waste from landfills, rivers, oceans and natural areas for use as feedstock to create new, sustainable, infinitely recyclable Loop™ PET plastic resin and polyester fiber. We believe our technology can deliver a cost-effective and profitable virgin quality PET plastic resin suitable for use in food-grade packaging.

Our Generation I technology process yielded polyethylene terephthalate ("PTA") and monoethylene glycol ("MEG"), two common monomers of PET plastic, through depolymerization. While monomers were of excellent purity and strong yield, we continued to challenge ourselves to drive down cost and eliminate inputs. It was during this process that we realized we could eliminate water and chlorinated solvents from the purification process, reduce the number of reagents from five to two and reduce the number of purification steps from 12 to four, if we shifted from the production of PTA to the production of dimethyl terephthalate ("DMT"), another proven monomer of PET plastic that is far simpler to purify. Since June 2018, when we transitioned to our Generation II technology and our newly built industrial pilot plant, we continue to see consistently high monomer yields, excellent purity and improved conversion costs[.]

This shift, from producing the monomer PTA to the monomer DMT was a pivotal moment for Loop. The Generation II technology is more cost-effective, easier to commercialize, more economical for our customers and requires less energy and fewer resource inputs than conventional PET production processes. We believe it to be one of the most environmentally sustainable methods for producing virgin quality food-grade PET plastic in the world.

To protect our technology, and in addition to the patents we hold for our Generation I (or "GEN I") technology, we have patents pending for our Generation II (or "GEN II") technology in various jurisdictions around the world. On April 9, 2019, the GEN II U.S. patent was formally approved and issued. Freedom to Operate searches have also been conducted that indicate no conflicts with any of our existing patents or applications and we adhere to rigorous internal data and confidentiality controls.

20.     The 2019 10-K also described Loop's commercialization progress as follows:

**Commercialization Progress**

During the year ended February 28, 2019, we continued executing our corporate strategy where Loop focused on developing three major streams of revenue. These revenue streams are expected to be from the sale of Loop™ PET plastic resin and polyester fiber to customers from our joint venture with Indorama Ventures Limited ("IVL"), license fees from our Waste-to-Resin ("WtR™") facilities and development fees from the sale and construction of WtR™ facilities around the world.

In September 2018, in connection with the first of these streams, we announced a joint venture with IVL to manufacture and commercialize sustainable Loop™ branded PET plastic resin and polyester fiber to meet the growing global demand from beverage and consumer packaged goods companies. The joint venture agreement details the establishment of a 20,700 metric tonnes facility in the southeastern United States. As the 20,700 metric tonnes production capacity is fully subscribed by customers. [*sic*] which include Danone, PepsiCo, and Coca-Cola's Cross Enterprise Procurement Group, the joint venture is evaluating increasing the capacity of the facility. The facility is expected to commence production in the second half of the calendar year 2020.

Also, in the 2019 fiscal year, we secured key partners such as Thyssenkrupp Industrial Solutions("tKIS"), built our brand and continued to secure the feedstock needed to support our commercial success.

21.     Furthermore, the Company's 2019 10-K stated:

**Our technology may not be successful in developing commercial products.**

We and our potential future collaborators may spend many years and dedicate significant financial and other resources developing our technology that may never be successfully commercialized. Our technology may never become successfully commercialized for any of the following reasons:

- we may not be able to secure sufficient funding to progress our technology through development and commercial validation;

- we or our future collaborators may be unable to obtain the requisite regulatory approvals for our technology;

- competitors may launch competing or more effective technology;

- our technology may not be commercially successful;

- current and future collaborators may be unable to fully develop and commercialize products containing our technology or may decide, for whatever reason, not to commercialize such products; and

- we may be unable to secure adequate patent protection in the necessary jurisdictions.

If any of these things were to occur, it could have a material adverse effect on our business and our results of operations.

22.    The 2019 10-K also set forth Loop's results of operations for the year ended February 28, 2019, stating, in relevant part:

**Fiscal Year Ended February 28, 2019**

The net loss for the year ended February 28, 2019 increased by $3.5 million, to $17.5 million, as compared to the net loss for the year ended February 28, 2018 which was $14.0 million. The increase is primarily explained by higher general and administrative expenses of $6.0 million, an increase in depreciation and amortization and impairment of intangible assets of $0.4 million, an increase in interest and other finance costs of $0.5 million, offset by lower research and development expenses of $3.3 million and foreign exchange of $0.1 million.

Research and development expenses for year ended February 28, 2019 amounted to $3.5 million compared to $6.7 million for the year ended February 28, 2018, representing a decrease of $3.2 million, or $0.8 million excluding stock-based compensation. The decrease of $0.8 million was primarily attributable to lower employee related expenses of $0.2 million as well as lower professional fees of $0.6 million . . . .

General and administrative expenses for the year ended February 28, 2019 totaled $12.9 million compared to $6.9 million for the year ended February 28, 2018, representing an increase of $6.0 million, or $2.1 million excluding stock-based compensation and the legal settlement . . . .

Depreciation and amortization for the year ended February 28, 2019 totaled $0.5 million compared to $0.4 million for the year ended February 28, 2018, representing an increase of $0.1 million. The increase is mainly attributable to an increase in the amount of fixed assets held at the Company's pilot plant and corporate offices. Impairment of intangible assets for the year ended February 28, 2019 totaled $0.3 million compared to nil for the year ended February 28, 2018, representing an increase of $0.3 million. The increase is mainly attributable to the write-off of the remaining intangible asset balance of the GEN I technology of $0.3 million and a $0.1 million increase due to additions of capital assets in the pilot plant for research and development.

23.    On May 5, 2020, Loop filed its annual report on Form 10-K with the SEC for the period ended February 29, 2020 (the "2020 10-K"). Therein, Loop touted its "Proprietary Technology and Intellectual Property," stating, in relevant part:

The power of our technology lies in its ability to use as feedstock what is currently considered waste PET plastic and polyester fiber from landfills, rivers, oceans and natural areas to create new, sustainable, infinitely recyclable Loop™ PET resin and polyester fiber. We believe our technology can deliver a cost-effective and profitable virgin quality PET resin suitable for use in food-grade packaging.

Our Generation I ("GEN I") technology process yielded purified terephthalic acid ("PTA") and monoethylene glycol ("MEG"), two common monomers of PET, through depolymerization. While the monomers were of excellent purity and strong yield, we continued to challenge ourselves to drive down costs and eliminate inputs. It was during this process that we realized we could simplify our process and increase yields at a lower cost, namely by eliminating water and chlorinated solvents from the depolymerization process and reducing the number of reagents from five to two, if we shifted from the production of PTA to the production of dimethyl terephthalate ("DMT"), another proven monomer of PET that is far simpler to purify. Since June 2018, when we transitioned to this Generation II ("GEN II") technology and our newly built industrial pilot plant, we continue to see consistently high monomer yields, excellent purity, and improved conversion costs.

This shift, from producing the monomer PTA to the monomer DMT, was a pivotal moment for Loop Industries. We believe that the GEN II technology requires less energy and fewer resource inputs than conventional PET production processes. We also believe it is one of the most environmentally sustainable methods for producing virgin quality food-grade PET plastic in the world.

In connection with the continuing development of our GEN II technology, we continued to invest in our industrial pilot plant. We made capital investments in the pilot plant of $2,439,013 during the year ended February 29, 2020.

24.    Moreover, regarding its commercialization progress, Loop stated in its 2020 10-K, in relevant part:

During the year ended February 29, 2020, we continued executing our corporate strategy where Loop Industries focused on developing two distinct business models for the commercialization of Loop™ PET resin and polyester fiber to customers: 1) from our joint venture with Indorama, and 2) from our Infinite Loop™ greenfield facilities. We continue to develop the engineering of the Infinite Loop™ platform

and we have increased our focus on the development of Infinite Loop™ projects in Europe and in North America.

In September 2018, in connection with one of our business models, we announced a joint venture with Indorama to retrofit their existing PET manufacturing facilities. The joint venture was formed with the objective to manufacture and commercialize sustainable Loop™ PET resin and polyester fiber to meet the growing global demand from beverage and consumer packaged goods companies. The joint venture agreement details the establishment of an initial 20,700 metric tons per year facility in Spartanburg, South Carolina, in the southeastern United States.

Following the decision of the joint venture with Indorama to double the capacity of the planned Spartanburg plant due to customer demand to 40,000 metric tons per year as disclosed in our 10-Q for the period ended August 31, 2019, we identified a number of enhancements to the plant design to improve the operability and optimize the total construction cost of the plant. We announced that the commissioning of the plant is expected to take place in the third quarter of calendar 2021. All parties are working diligently towards achieving this timetable although we are monitoring the impact of COVID-19 on the project. as well as the operations of our partners. The commissioning date may be impacted by the COVID-19 pandemic.

We have currently contracted for the sale of the initial 20,700 metric tons expected output of the Spartanburg facility and we continue discussions to contract the additional volume up to its planned increased capacity of 40,000 metric tons.

25.     The 2020 10-K further stated:

**Our technology may not be successful in developing commercial products.**

We and our potential future collaborators may spend many years and dedicate significant financial and other resources developing our technology that may never be successfully commercialized. Our technology may never become successfully commercialized for any of the following reasons:

- We may not be able to secure sufficient funding to progress our technology through development and commercial validation;

- We or our future collaborators may be unable to obtain the requisite regulatory approvals for our technology;

- Competitors may launch competing or more effective technology;

- Our technology may not be commercially successful;

- Current and future collaborators may be unable to fully develop and commercialize products containing our technology or may decide, for whatever reason, not to commercialize such products; and

- We may be unable to secure adequate patent protection in the necessary jurisdictions.

If any of these things were to occur, it could have a material adverse effect on our business and our results of operations.

26.    The 2020 10-K also summarized Loop's results of operations for the year ended

February 29, 2020, stating, in relevant part:

The net loss for the year ended February 29, 2020 decreased by $3.03 million, to $14.51 million, as compared to the net loss for the year ended February 28, 2019 which was $17.54 million. The decrease is primarily explained by lower general and administrative expenses of $5.64 million, an increase in interest income of $0.50 million and a decrease of impairment of intangible assets of $0.30 million offset by an increase in research and development expenses of $1.27 million, an increase in interest and other finance costs of $1.76 million, an increase in depreciation and amortization of $0.33 million and an increase in foreign exchange of $0.05 million.

Research and development expenses for year ended February 29, 2020 amounted to $4.72 million compared to $3.45 million for the year ended February 28, 2019, representing an increase of $1.27 million, or $1.18 million excluding stock-based compensation. The increase of $1.18 million was primarily attributable to higher employee related expenses of $1.01 million, increased purchases and consumables of $0.21 million, higher travel costs of $0.06 and higher facilities costs of $0.05 offset by lower professional fees of $0.30 million. The increase in non-cash stock-based compensation expense of $0.09 million was attributable to the timing of certain stock awards provided to employees.

General and administrative expenses for the year ended February 29, 2020 totaled $7.22 million compared to $12.85 million for the year ended February 28, 2019, representing a decrease of $5.64 million, or $0.99 million excluding stock-based compensation and the legal settlement . . . .

Depreciation and amortization for the year ended February 29, 2020 totaled $0.83 million compared to $0.50 million for the year ended February 28, 2019, representing an increase of $0.33 million. The increase is mainly attributable to an increase in the amount of fixed assets held at our pilot plant and corporate offices. Impairment of intangible assets for the year ended February 29, 2020 was nil compared to $0.30 million for the year ended February 28, 2019, representing a decrease of $0.3 million. The decrease is mainly attributable to the write-off of the

remaining intangible asset balance of the GEN I technology of $0.3 in the year ended February 28, 2019.

27.    The above statements identified in ¶¶ 17-26 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) Loop scientists were encouraged to misrepresent the results of Loop's purportedly proprietary process; (ii) Loop did not have the technology to break PET down to its base chemicals at a recovery rate of 100%; (iii) as a result, the Company was unlikely to realize the purported benefits of Loop's announced partnerships with Indorama and thyssenkrupp; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## The Truth Emerges

28.    On October 13, 2020, Hindenburg Research published a report alleging, among other things, that "[a] former Loop employee told us that Loop's scientists, under pressure from CEO Daniel Solomita, were tacitly encouraged to lie about the results of the company's process internally.  We have obtained internal documents and photographs to support their claims." Specifically, the report stated, in relevant part:

> **Former Loop Employee: "The Chemists Behind the Technology Are Liars"**
>
> **Former Loop Employee: "I've Seen False Numbers. I've Seen 'I Want This Sample, Give Me This Result. I Don't Want To See Anything Else. I Want To See This Result'."**
>
> After speaking to former Loop employees, we believe we understand the dysfunctional dynamics at play within the company.
>
> When asked how it was possible that the chemists and experts we interviewed (whose opinions are detailed later in this report) didn't see a way for Loop's process to be cost efficient, but that Loop did, they told us:

> "***The main problem was that the chemists behind [Solomita's] technology are liars. They made him hear what he wanted to hear...***I was working on the purification of the MEG and I was not successful at all. I worked on that for [redacted] and it was a painful recovery because some of the dyes were staying in the MEG (PET base chemical monoethylene glycol) and there was no way to remove them. I tried many, many things and I was not successful at all."

\* \* \*

**Two Former Loop Employees: The Company Has Two Labs. One For The Essaddam Family And One For "All The Other People".**

**Former Employee: "When It Was Time to Talk About Results, They Were Hiding Things And Bypassing Us To Go Present Results To The Boss"**

Based on what we were told by former employees, it seems like the 'miracle' results and successes that were being produced at Loop came out of a separate lab for the Essaddam family that had been sequestered from other Loop employees.

Two former employees confirmed the existence of separate labs to us. The first said:

> "***When I was there, there was two labs. One of them was for the Essaddam family. And one of them other was for all the other people. We would not see what they were doing.*** It was in the same building; it was one on the second floor and one on the first floor. We could go into the lab but at some point, it was dangerous because they had an explosion in their lab from toxic fumes since they were doing so many crazy things in there. We would never go in there. I was trying to avoid it as much as possible."

The first also told us about suspicious results that were coming out of the Essaddams' lab and how the family separated themselves from the rest of the company's scientists:

> "They were friendly but at some point, ***when it was time to talk about results, they were hiding things and bypassing us to go present results to the boss.*** So, they would present their results and not ours. They had two faces. They had their father in the background for everything so they would discuss everything as a family. I'm sure like every day they would probably discuss that at the family dinner. I have a couple of other friends that left because they couldn't stand it anymore."

> "There was always a group saying 'they did this again...' 'They brought samples and wouldn't tell them what it was' and 'when we gave results, they weren't happy about it...'"

We were also told that the problem was that the process being used in the R&D lab was not shared with the other lab – it was kept secret even within the company – supposedly because Solomita was worried that it would be leaked to competitors.

The second employee explained that processes in the R&D lab weren't documented well enough for the analytical lab to know how the results were being achieved:

> "In chemistry you get taught you have to follow a protocol. You have to write everything. You write what you do and you do what you write. You make a clear and explicit action plan beforehand. That's something that you learn formally. That's something you need to implement in your mentality."

> "Ultimately if you have your QC (quality control) that comes and tells you 'Hey this is a really good batch, keep tweaking on these parameters', you need to be able to know 'OK what did I do exactly to get this particular sample. *And I feel like there's where there was a little bit of gap. If it wasn't perfectly documented, then you don't know how you got this really good sample*...'"

29.    The report also stated that "Loop's previous claims of breaking PET down to its base chemicals at a recovery rate of 100% were 'technically and industrially impossible,'" according to a former employee.  Specifically, the report stated, in relevant part:

**Former Employee: The Results Coming Out of the Secret Lab Were, At Times, Blatantly Impossible**

The first former employee recounted to us how results coming out of the Essaddam lab were sometimes simply "impossible".  For example, in one case they claimed the process produced more solution than was initially put in. (Analogous to somehow turning 1 gallon of input into 2 gallons of output.)  The employee concluded:

> "I was not getting along with the Essaddam family. *I am a very honest person, a chemist who respects the code of ethics. In my point of view, a lie and falsifying results is not acceptable. I was not shy to say it.*

> *When a chem came from the lab into a meeting and said 'I got it! I was successful' I would say it's impossible, you got more than*

*what you sampled in the initial solution that you treated.* They
would say 'no that's not true.'"

\* \* \*

We spoke to a former employee that worked at Loop around the time of this claim,
who told us the claim of a 100% recovery was "technically impossible" and
"industrially impossible".

They also told us that "yields were not even repeatably over 90% at the lab scale"
in October 2016, nearly 4 months after the company had already claimed a 100%
recovery rate in public filings.

A polymer expert we interviewed, who has had no contact with the former
employee, told us that a reclaim of 100% of PTA (purified terephthalic acid) and
EG (ethylene glycol) base chemicals from PET is "impossible". The expert also
said that even "over 90%" would be "a stretch."

30.     Moreover, the report alleged that "Executives from a division of key partner

Thyssenkrupp, who Loop entered into a 'global alliance agreement' with in December 2018, told

us their partnership is on 'indefinite' hold and that Loop 'underestimated' both costs and

complexities of its process."

**Indorama Joint Venture: Announced By Loop In 2018 With An Expected
Start Date Of Q1 2020 – Yet Indorama Tells Us The Project Is "Still Being
Finalized"**

One of the biggest partnerships the company touts is its joint venture with
established global polyethylene manufacturer Indorama.

The 50-50 JV was announced on September 24, 2018. Both Loop and Indorama put
$500,000 cash into the venture in April 2019. The company announced that the JV
would have "an exclusive world-wide license to use Loop's technology to produce
100% sustainably produced PET resin and polyester fiber with plans to begin
commercial production in Q1 2020." . . . Now, both Loop and Indorama have
indicated that the JV terms have not even been finalized, almost 2 years after the
announcement. Loop's most recent 10-Q, filed in October 2020 says:

> "Discussions on the joint venture structure and financing are on-
> going."

\* \* \*

CLASS ACTION COMPLAINT

**Loop Partner Thyssenkrupp: Contract With Loop Is "Basically" On "Indefinite" Hold Due To Indorama Partnership Going "Silent"**

On December 19, 2018, Loop entered into a "Global Alliance Agreement" with the industrial solutions division of ~$3 billion German multi-national engineering and steel company Thyssenkrupp. The press release boasted that the agreement with that division, called Uhde Inventa-Fischer GmbH, would be a "strategic alliance expected to shape the future of PET and Polyester manufacturing".

The companies had planned to "license the respective technologies developed by Loop and thyssenkrupp Industrial Solutions to manufacturing partners in geographical regions around the world" by rolling out a "Waste To Resin" solution that would help companies achieve their goals of using 100% sustainable PET and polyester.

On October 12, 2020, we spoke to two senior executives at Uhde Inventa-Fischer GmbH.

We asked how they would characterize the state of Thyssenkrupp's contract with Loop and were told by one senior executive that it was "on hold" and contingent on whether or not Loop moves forward with its Indorama partnership:

> "It's depending on whether there will be a first project or not (with Indorama). If there's no first project there's no path forward...It's basically on hold. The contract is on hold and is silent on whether Indorama will further collaborate with Loop."

A second executive at Uhde Inventa-Fischer GmbH confirmed this to us, stating:

> "At the moment this (contract) is more or less for an indefinite time on hold. There was a project on-going with Loop but cooperation stopped maybe three months ago for the project with Indorama and since then according to my knowledge there is no further cooperation on-going and no further cooperation is planned."

The second executive also told us that Thyssenkrupp was supposed to be involved, to some degree, in the Indorama partnership, but that it's "not happening at the moment":

> "For the contract between Loop and Indorama I don't know. That's between them. But for our part we delivered the basic but there's no further contract between us and Loop. At one time we talked about being involved in the detail but it's not happening for the moment."

31.     On this news, the Company's stock price fell $3.78 per share, or over 32%, to close at $7.83 per share on October 13, 2020, thereby damaging investors.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Loop securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Loop's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Loop shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Loop or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Loop; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

38.     The market for Loop's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Loop's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Loop's securities relying upon the integrity of the market price of the Company's securities and market information relating to Loop, and have been damaged thereby.

39.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Loop's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Loop's business, operations, and prospects as alleged herein.

40.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Loop's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

41.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.     During the Class Period, Plaintiff and the Class purchased Loop's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information

alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

43.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Loop, their control over, and/or receipt and/or modification of Loop's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Loop, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

44.    The market for Loop's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Loop's securities traded at artificially inflated prices during the Class Period.   On September 23, 2019, the Company's share price closed at a Class Period high of $17.98 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Loop's securities and market information relating to Loop, and have been damaged thereby.

45.    During the Class Period, the artificial inflation of Loop's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages

sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Loop's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Loop and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

46.     At all relevant times, the market for Loop's securities was an efficient market for the following reasons, among others:

(a)     Loop shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Loop filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Loop regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Loop was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

47.    As a result of the foregoing, the market for Loop's securities promptly digested current information regarding Loop from all publicly available sources and reflected such information in Loop's share price.  Under these circumstances, all purchasers of Loop's securities during the Class Period suffered similar injury through their purchase of Loop's securities at artificially inflated prices and a presumption of reliance applies.

48.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

49.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Loop who knew that the statement was false when made.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

50.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Loop's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

52.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Loop's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.  All Defendants are sued either

as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Loop's financial well-being and prospects, as specified herein.

54.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Loop's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Loop and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

55.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's

management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

56.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Loop's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Loop's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiff and the other members of the Class acquired Loop's securities during the Class Period at artificially high prices and were damaged thereby.

58.      At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Loop was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Loop securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.      By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

61.      Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.      The Individual Defendants acted as controlling persons of Loop within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to

influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64.    As set forth above, Loop and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  October 28, 2020                          Respectfully submitted,


**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

Friday, October 16, 2020

# Loop Industries, Inc. (LOOP)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.  I make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Loop Industries, Inc. ("Loop" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Loop securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Loop securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Loop securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


**Name**

**Print Name**
michelle bazzini

**Signature**



redacted

**Loop Industries, Inc. (LOOP)**                                          **Bazzini, Michelle**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 5/8/2020 | 263 | $9.7270 |